

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

RTP:JAM/FTB
F.# 2016R02202

*271 Cadman Plaza East
Brooklyn, New York 11201*

January 28, 2022

By ECF and Email

The Honorable Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Richard Zavada
              Docket No. 21-CR-468 (CBA)

Dear Judge Amon:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is currently scheduled for January 31, 2022. On October 4, 2021, the defendant waived indictment and pleaded guilty to an information, charging a violation of the Travel Act pursuant to 18 U.S.C. § 1952(a)(3). As delineated in the written plea agreement and as stipulated by the defendant, the government estimates that the defendant's advisory range of imprisonment, per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), is 24 to 30 months. This is the same range calculated by the United States Department of Probation in the Pre-Sentence Investigation Report ("PSR"). See PSR at ¶ 119. In his January 15, 2022 submission (the "defense submission"), the defendant requests a non-incarceratory sentence.

      For the reasons set forth in the PSR and herein, the government recommends that the Court impose a sentence within the advisory range of imprisonment of 24 to 30 months to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law and abuse of his position, and (3) the need for deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

I.  Factual Background

The PSR accurately summarizes the offense conduct, a commercial bribery scheme that began in the wake of Hurricane Sandy. See PSR at ¶¶ 4-62. The defendant and four separately-charged defendants – Patrick McCrann, Devraj Balbir, Ricardo Garcia and Jevan Seepaul – were employed by National Grid plc ("National Grid"), a publicly traded utilities company, and solicited and received bribe payments from vendors who did business with National Grid. Most notable among these vendors were two companies owned by the same individuals, Cooperating Witness 1 ("CW-1") and Cooperating Witness 2 ("CW-2") (collectively, the "Contractor"). See PSR at ¶¶ 4-11. Notably, between December 2014 and February 2020, the Contractor received more than $50 million in payments from National Grid.

The defendant was employed in National Grid's Facilities Department for approximately 33 years and at times was responsible for managing National Grid's facilities on Long Island. See PSR at ¶ 6.

A. Overview of the Investigation and the Bribery Scheme

In January 2020, the FBI received information that CW-1 and CW-2 paid bribes on behalf of the Contractor to various representatives of National Grid, including the defendant, in order to receive work from National Grid. See PSR at ¶ 11. In or about July 2020, CW-1 and CW-2 began cooperating with the government's investigation, including meeting with FBI special agents on several occasions. Id. CW-1 and CW-2 admitted having made bribe payments to the defendant and other National Grid employees to secure work from National Grid and to receive other favorable treatment for the Contractor relating to its work at National Grid. See PSR at ¶¶ 11-17. This favorable treatment included, but was not limited to, the following: providing non-public information about competitors' bids; awarding no-bid contracts; structuring the value of contracts to avoid additional approval requirements and providing favorable performance reviews. Id. CW-1 and CW-2 further acknowledged that they continued to pay bribes for fear that, in the absence of such payments, the defendant could harm the Contactor's ability to continue to do work for National Grid. Id. Further, the defendants had the authority to slow or stop disbursement of project funds to the Contractor, provide negative performance reviews regarding the Contractor's work or otherwise claim that the Contractor's work did not meet contractual specifications. Id. As such, the defendant was in a position to cause significant economic harm to National Grid vendors, such as the Contractor, who failed to pay the kickbacks they demanded.

B. The Defendant's Role in the Bribery Scheme

In or about 2013, the Contractor began submitting bids to perform work for National Grid. In or about 2014 or 2015, both the defendant and Patrick McCrann, another manager in the Facilities Department, indicated to CW-1 that they were unhappy with a vendor ("Vendor-1") who had performed work for National Grid. See PSR at ¶ 13. Based on these conversations, CW-1 suspected Vendor-1 had been making bribe payments to the defendant and McCrann. CW-1's suspicions were confirmed during a series of meetings with the

2

defendant. During the meetings, the defendant indicated he had an agreement with Vendor-1 pursuant to which the defendant would receive a kickback of 5% of the total payments that Vendor-1 received for all jobs performed for National Grid in which the defendant was involved. See PSR at ¶¶ 11-13. When the Contractor began performing work for National Grid that the defendant supervised, the defendant made clear that he could elect to use vendors other than the Contractor to perform work for National Grid. Id. Indeed, CW-1 and CW-2 understood that the defendant, McCrann and other National Grid supervisors had the authority to select any approved vendor, without relying on a bidding process, for contracts valued at less than $50,000. See id. CW-1 and CW-2 further understood, based on their conversations with the defendant and McCrann, that National Grid supervisors could make the performance of the Contractor's job and the receipt of payment from National Grid very difficult for the Contractor if the bribes they sought were not paid. Id. As such, CW-1 and CW-2 agreed to make bribe payments to the defendant, McCrann and ultimately to Balbir, Garcia and Seepaul.

    C. The Defendant's Communications with the Contractor in Furtherance of the Bribery Scheme

The defendant repeatedly communicated with CW-1 or CW-2 via text message to solicit bribe payments from the Contractor while the Contractor was performing work for National Grid. The communications below, which are described in the PSR in paragraphs 18-25, reflect a non-exhaustive sample of those communications:

On or about March 29, 2017, the defendant and CW-1 had the following exchange, where the defendant wanted CW-1 to purchase a recreational vehicle for him:

| | |
|---|---|
| Defendant: | Do you need the wiring information or RV [recreational vehicle] number? |
| CW-1: | The phone number of rv shop. |
| Defendant: | The number is [phone number of recreational vehicle dealership] |

CW-1 in fact purchased more than one recreational vehicle as a bribe payment to the defendant.

On or about December 2, 2018, the defendant and CW-1 had the following text message exchange regarding hotel accommodations the Contractor had arranged and paid for on behalf of the defendant:

| | |
|---|---|
| Defendant: | Who was it you spoke too? They have me in a Cottage??? Im on hold |
| CW-1: | They said that was the best accommodation and guarantees the king beds |

Bank records and records obtained from the Contractor further reflect that CW-1 arranged and paid for the defendant's travel to various locations, including an overseas vacation.

On or about February 13, 2020, the defendant sent CW-1 a text message which read: "Can you please pay this thank You." Attached to the text message was an image of an invoice from a landscaping company for $1,710.77 for work performed at the defendant's residence. CW-1 advised this was one of many personal expenses paid for by the Contractor as a bribe to the defendant.

On or about August 27, 2020, CW-1, acting at the direction of FBI special agents, consensually recorded a meeting with the defendant, which occurred at the defendant's residence in Long Island, New York. See PSR ¶ 23. During the meeting, CW-1 discussed the amount of money the defendant claimed the Contractor "owed" the defendant for work performed for National Grid. When CW-1 questioned the defendant's calculation, the defendant asked CW-1, "Who are you?" and indicated, in sum, substance and part that CW-1 was not in a position to question the defendant. The defendant further stated, in sum, substance and part that he had referred CW-1 work for the Contractor from clients other than National Grid. The defendant indicated he had been very fair and frugal with CW-1 in his calculations and was not seeking money for all the other work that the defendant had referred to CW-1. During the same conversation, the defendant made clear he would withhold payments due from National Grid to the Contractor, if CW-1 did not make the requested payments. The defendant stated that, due to changes taking place at National Grid, "I need to cash in and cash out. Tomorrow they may give me the (expletive) boot." The defendant ultimately told CW-1 that he (the defendant) would "work" with CW-1 on the amount that the defendant expected to receive from the Contractor.

D. The Search Warrant Execution

On November 18, 2020, FBI special agents executed a search warrant on the defendant's residence in Long Island, New York. See PSR at ¶¶ 24-25. Among the items seized during the search were electronic spreadsheets maintained by the defendant that contained dates, the amounts of bribe payments, and the names of various entities which provided facilities services to National Grid. Id. Among the entities identified in the spreadsheets was the Contractor. Based on the spreadsheets and the August 27, 2020 meeting between CW-1 and the defendant described above, the defendant had calculated that he was "owed" more than $100,000 from the Contractor relating to work performed for National Grid in 2018 and more than $200,000 for work performed in 2019. Id. In addition, the spreadsheets listed multiple other Company vendors from whom the defendant evidently received bribe payments. Id.

E. The Defendant's Arrest and Plea

On June 17, 2021, the defendant and the other aforementioned separately-charged defendants were arrested and charged by complaint with violating the Travel Act. On October 4, 2021, following plea negotiations with the government, the defendant waived

4

indictment and pleaded guilty to an information charging a violation of the Travel Act, pursuant to 18 U.S.C. § 1952(a)(3). The written plea agreement, executed by the defendant, contained a forfeiture stipulation effecting the disgorgement of profits from the bribery scheme, including $300,100 in cash seized from a safe deposit box; $30,635 in cash seized from his home; and a money judgment of $187,000.

II.     Sentencing Range and Guidelines Calculation

The Travel Act Violation carries a maximum possible term of imprisonment of 5 years. The government submits that the Guidelines calculation outlined in the PSR and stipulated to by the parties in the plea agreement should be applied. This results in an adjusted offense level of 17 and a range of imprisonment of 24 to 30 months, as the defendant is in Criminal History Category I. See PSR at ¶¶ 70-82.

III.    Argument

   A. The Offense Conduct is Serious

The defendant's criminal conduct was serious. By soliciting and accepting bribes, the defendant not only abused his managerial position with National Grid, but also distorted the bidding process and execution of National Grid contracts. While the contracts involving the Contractor appear to have been at market value, i.e., not inflated to any material extent, the defendant's conduct necessarily affected National Grid's business and prevented other local vendors from participating in a fair, open procurement process. Beyond the parties immediately affected, this type of criminality also affects taxpayers and consumers at large. The defendant's intelligence, education and ability to influence others through his position make his crime all the more inexcusable. Rather than arising from necessity or adverse circumstances, the defendant's criminality was motivated by hubris and greed.

   B. The Need for Deterrence is High

The Court's sentence must act as a deterrent. While the defendant will not likely be in a position to commit similar crimes in the future, the Court's sentence must deter similarly-situated individuals from engaging in such behavior. Because the instant offense is an economic crime and involved "rational, cool, and calculated" decision making over a period of time, rather than "sudden crimes of passion or opportunity, [it is a] prime candidate for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). Indeed, the defendant engaged in deliberate, premeditated conduct, making the instant offense appropriate for general deterrence.

The need for deterrence is particularly acute in this case, which involves commercial bribery, as such conduct is endemic in the Eastern District, particularly on Long Island. The defendant's sentence must act to protect the integrity of the commercial environment in this district and help ensure that businesses compete on a level, honest playing field.

C. The Defendant's Acceptance of Responsibility and Mitigating Factors are Noteworthy

Several mitigating factors should be considered by the Court when fashioning an appropriate sentence.

First, upon being confronted by law enforcement agents, the defendant did not attempt to deny or diminish his conduct. Nor did he attempt to minimize or secrete the illicit proceeds he had received from his conduct. He agreed to self-surrender, waive indictment and plead guilty in a timely manner, thereby saving both the government's and the Court's time and resources in litigation. While the defendant has already received a downward adjustment in the Guidelines for acceptance of responsibility, his contrition may also be considered by the Court as relevant to his "history and characteristics." 18 U.S.C. § 3553(a)(1); see also United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that acceptance of responsibility may be considered during the 3553(a) analysis and "further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).



Third, the defendant has significant health issues that will make a prolonged period of incarceration difficult, particularly during the COVID-19 pandemic. As noted in the PSR, the defendant's health may be considered a mitigating factor at sentencing. See PSR at ¶¶ 86-106, 131.

---



IV.   Forfeiture

The defendant agreed in his plea agreement to forfeit $30,635 in cash seized from his residence and $300,100 in cash seized from a safe deposit box. He further agreed to the entry of a forfeiture money judgment in the amount of $187,000. The government respectfully requests that the Court enter an order of forfeiture reflecting this and make that order part of the judgment in the case.

V.   Restitution

On January 21, 2022, National Grid filed a brief as an interested party, arguing that it is entitled to restitution under the Mandatory Victim Restitution Act ("MVRA"). See generally 18 U.S.C. § 3663A. Specifically, National Grid seeks reimbursement for two categories of expenses: First, National Grid seeks the repayment of all compensation (salary and benefits) paid by National Grid to the defendant for the time period covered by the defendant's offense of conviction. Second, National Grid requests reimbursement for the legal fees it incurred in responding to requests for information from the government (both formal and informal) during the course of the investigation that resulted in the charges in this case. For the reasons set forth below, the government generally agrees that National Grid is entitled to the second category of restitution (reimbursement of legal fees). The first category of restitution – 100% of all compensation paid to the defendant – is difficult to justify under prevailing caselaw based on the facts in this case.

As an initial matter, the government agrees that National Grid qualifies as a "victim" under the MVRA. The MVRA defines "victim" as any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." Among the offenses for which the MRVA requires restitution are all Title 18 "offense[s] against property," including "any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(ii). The Second Circuit recently clarified that courts should look to the "facts and circumstances" of the crime of conviction to determine whether it qualifies as an "offense against property" under the MVRA. See United States v. Razzouk, 984 F.3d 181, 186-88 (2d Cir. 2020). This includes, at a minimum, the manner in which the crime was committed, including whether the crime was committed by "fraud and deceit." See id. Thus, even if the deprivation of property is not expressly an element of the underlying crime, restitution may still be warranted upon a finding of losses resulting from the crime. See id.

In this case, the defendant, as described above, corrupted National Grid's contracting procedures in exchange for bribe payments. Courts in this district have held that employers may recover compensation paid to compromised employees under the MVRA in similar circumstances. See, e.g., United States v. Bahel, 662 F.3d 610, 649 (2d Cir. 2011) ("There is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less."); United States v. Donaghy, 570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008) (Amon, J.) ("Whereas here, the defendant is an employee who was compensated under the false pretense that he was rendering honest services to his employer, the correct measure of loss is the amount of the defendant's

compensation that was paid for the portion of his services that were dishonest."). This is true even if – as here – the defendant's conduct did not result in any independent cognizable losses to the victim. See, e.g., United States v. Napout, 15-CR-252 (PKC), 2018 WL 6106702, *9-*12 (E.D.N.Y. Nov. 20, 2018) (finding no cognizable loss to soccer organization in terms of inflated contract prices as a result of bribes to defendants, but awarding restitution in the amount of 20% of defendants' compensation during the relevant time period).[2]

        Determining the portion of a corrupt employee's compensation under the MVRA that is recoverable is generally acknowledged to be a difficult process. See, e.g., United States v. Coffin, et al., 09-CR-481 (ARR), 2011 WL 4962395, at *4 (E.D.N.Y. Oct. 18, 2011) ("The amount of restitution that each defendant owes is inherently difficult to ascertain."). The goal is to identify the "percentage [of compensation] representing the difference between the value of services rendered by [the] defendant and an honest employee." Id. at *2. In the absence of any independent losses to the victim employer, at least one court in this district declined to award any reimbursement for compensation paid to an employee who took bribes in part on the ground that doing so would necessarily be too arbitrary an exercise. See United States v. Adorno, 950 F. Supp. 2d 426, 431 (E.D.N.Y. 2013) ("[I]n this case, the parties' submissions make clear that any estimate would be too arbitrary to sustain and that a hearing to achieve a non-arbitrary result would involve protracted proceedings that, even if conducted, might well not produce a non-arbitrary result."). Other courts have been more comfortable awarding a portion of compensation as restitution, but, in those cases, the percentage of compensation identified has rarely exceeded 20%-25%. See, e.g., Napout, 2018 WL 6106702 at *2-*3, *12 (awarding 20% of compensation paid to executives of international soccer organization as restitution upon a finding that it would be "unduly complex" to delineate which portions of compensation were for dishonest services as opposed to honest services where defendants had violated their "core responsibility" to the organization and this violation "permeated all aspects of their activities"); Coffin, 2011 WL 4962395 at *5 (awarding varying percentages (ranging from 10% to 25%) of compensation for multiple defendants based on consideration of a number of factors, including "(i) the amount of bribes [each defendant] received; (ii) the amount of intended loss [each defendant's] scheme(s) created; (iii) the length of time [each defendant's] scheme(s) lasted; (iv) [each defendant's] level of seniority at [victim

---

[2] As noted above, National Grid is correct in its submission when it indicates that the government's investigation has not produced evidence that contract prices were inflated to any material degree as a result of the bribe payments in this case. Compare Razzouk, 984 F.3d at 189-90 (affirming multi-million dollar restitution award to victim utility company based on findings of losses substantiated by two forensic accounting firms in the form of documented overpayments for contracts tainted by bribes); see generally United States v. Finazzo, 850 F.3d 94, 117-18 (2d Cir. 2017) (vacating restitution order in Travel Act bribery case on the ground that the district court did not use a sound methodology to determine loss and reiterating that – in the absence of specific evidence – courts cannot assume that kickback payments in exchange for the award of contracts necessarily result in inflated prices for those contracts – rather, the evidence must establish a "direct correlation" between the bribe payments and any claimed losses).

utility company]; and (v) [each defendant's] level of participation in the scheme(s) relative to the other defendants"). The government is unaware of any case in this circuit in which 100% of all compensation has been awarded as restitution in circumstances similar to the facts of this case.

The MVRA also provides for compensation of "other expenses incurred during the [victim's] participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). In the Second Circuit, this has generally been understood to encompass attorneys' fees incurred by victims in responding to requests by the government for information related to a criminal investigation. See Napout, 2018 WL 6106702 at *4-*5, *8-*9. This is true, even after the Supreme Court's decision in Lagos v. United States, 138 S. Ct. 1684 (2018), which limited restitution for investigative costs to only those costs that the victim incurred at the request or the invitation of the government. See United States v. Razzouk, 11-CR-430 (ARR), 2021 WL 1422693, *2-*3 (E.D.N.Y. Apr. 15, 2021) (finding that Lagos did not abrogate existing Second Circuit law that investigative costs, including attorneys' fees are eligible – in certain circumstances – for reimbursement through restitution).

As such, the government agrees that an award of restitution to National Grid to reimburse it for reasonable attorneys' fees it incurred is warranted. The government requests that any award of restitution for attorneys' fees be joint and severable among the five identified defendants in National Grid's January 21, 2022 submission, as well as CW-1 and CW-2, who have pleaded guilty to related offenses in separate proceedings that remain under seal at this time.

9

<u>Conclusion</u>

   For the reasons set forth in the PSR and herein, the government respectfully requests that the Court impose a sentence within the advisory range of imprisonment of 24 to 30 months contemplated by the parties' plea agreement.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

       By:  /s/_____
          Artie McConnell
          F. Turner Buford
          Assistant U.S. Attorneys
          (718) 254-7000

cc:  Edward R. Palermo, Esq. (by Email and ECF)
   David Wikstrom, Esq. (by ECF and Email)
   Michelle B. Malko, United States Probation Officer (by E-mail)