```
                                                                        1

 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3   UNITED STATES OF AMERICA,     :    21-CR-467(CB
              Plaintiff,
 4
          -against-                :
 5
     PATRICK MCCRANN,              :
 6
              Defendant.           :
 7   - - - - - - - - - - - - - - - X
     UNITED STATES OF AMERICA,     :    21-CR-468(CBA)
 8            Plaintiff,
                                        United States Courthouse
 9        -against-                :    Brooklyn, New York

10   RICHARD ZAVADA,               :    January 31, 2022
                                        10:30 a.m.
11            Defendant.           :
     - - - - - - - - - - - - - - - X
12
                  TRANSCRIPT OF STATUS CONFERENCE
13             BEFORE THE HONORABLE CAROL B. AMON
                  UNITED STATES DISTRICT JUDGE
14   APPEARANCES:

15   For the Government:         JACQUELYN M. KASULIS
                                 United States Attorney
16                               BY: ARTIE MCCONNELL and
                                 TURNER BUFORD,
17                               Assistant United States Attorneys
                                 271 Cadman Plaza East
18                               Brooklyn, New York

19   For Defendant McCrann:      ANDREW KARPF, ESQ.

20   For Defendant Zavada:       DAVID WIKSTROM, ESQ. and
                                 EDWARD PALERMO, ESQ.
21
     For National Grid:          ANNA ESTEVAO, ESQ.
22
     Court Reporter:             Andronikh M. Barna
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

2

1         THE CLERK:  Good morning.
2         This is criminal cause for a status conference for
3  21-CR-467, USA vs. Patrick McCrann and 21-CR-468, Richard
4  Zavada.
5         May the parties please state your name for the
6  record, starting with the government?
7         MR. MCCONNELL:  Your Honor, good morning.
8         Artie McConnell and Turner Buford for the
9  United States.  We're joined at counsel table by Michelle
10 Malko from the Department of Probation.
11        And I'll also note for the record that counsel for
12 National Grid is present and in the audience.
13        THE COURT:  All right.  Good morning.
14        And for defense counsel, please?
15        MR. KARPF:  Andrew Karpf, 537 East Jericho Turnpike,
16 Huntington Station, for Defendant Patrick McCrann.
17        Good morning, Judge.
18        THE COURT:  Good morning.
19        MR. WIKSTROM:  David Wikstrom for Mr. Zavada.
20        Good morning, Your Honor.
21        THE COURT:  Good morning.
22        MR. PALERMO:  Edward Palermo for Mr. Zavada as well.
23        Good morning, Your Honor.
24        THE COURT:  Good morning.
25        All right.  Everyone can be seated.

1    I changed this to a status conference because there
2 are other similarly situated defendants before the Court and
3 one of the things that the Court has to take into account in
4 determining an appropriate sentence of many defendants is the
5 need to avoid disparity among people who are similarly
6 situated.  And recognizing that there are several other
7 defendants who have entered guilty pleas and their PSRs are at
8 various stages of production, I am going to adjourn the
9 sentencing of all of the defendants to the same day so that we
10 can address those issues.
11    And, Ms. Campbell, I think we determined that that
12 day was May 6th; is that correct?
13    THE CLERK:  That's correct, Judge, May 6th was the
14 date, at 10:00 a.m.
15    THE COURT:  All right.  So does that work with
16 everyone's schedules?
17    MR. MCCONNELL:  That's fine for the government,
18 Judge.
19    THE COURT:  Okay.
20    MR. KARPF:  That date is fine for Mr. McCrann,
21 Judge.
22    THE COURT:  Okay.  Thanks.
23    MR. PALERMO:  Also good for Mr. Zavada, Your Honor.
24    THE COURT:  Okay.  Good.
25    Now, you will note that for the other defendants who

4

1  may have different dates other than May 6th, Ms. Campbell, you
2  will advise them of that day?
3              THE CLERK:  Yes, Judge.  Yes, Judge.
4              THE COURT:  In the interim, I would like the
5  government to address by letter to the Court their view of the
6  relevant guideline range for each of these defendants.
7              And, Ms. Campbell, just so we are clear, could you
8  give us the names of the defendants?  It is obviously the two
9  defendants before the Court, Mr. McCrann and Mr. Zavada.  And
10 the names of the others who we have scheduled for sentencing,
11 just the names of those other defendants?
12             THE CLERK:  Yes, Judge.
13             So we have Ricardo Garcia, Jevan Seepal, and
14 Mr. Balbir.
15             THE COURT:  Okay.  I would like the government to
16 write a letter to the Court addressing what your view of the
17 relative culpability of each of the individual defendants are
18 and indicating your view of the guideline range with respect
19 to each of those defendants.  And if the government could
20 provide that letter to the Court by let's say the first Friday
21 in March.
22             What date would that be, Ms. Campbell?  I do not
23 have a calendar in front of me.
24             THE CLERK:  March 4th.
25             THE COURT:  All right.

5

1  THE CLERK: March 4th.
2  THE COURT: And any response, if the defendants wish
3  to address that, on March 18th.
4  And those dates will also apply to the other
5  defendants, Ms. Campbell, that you mentioned.
6  THE CLERK: Yes, Judge. Yes.
7  THE COURT: All right. The other issue I would like
8  to take up is the issue of restitution.
9  Now, we have counsel here representing National
10 Grid?
11 MS. ESTEVAO: Yes, Your Honor.
12 THE COURT: Okay. Yes, if you can step up.
13 Just state your name for the record, please.
14 MS. ESTEVAO: Anna Estevao of Sher Tremonte, LLP.
15 THE COURT: Okay. Before I hear from you, let me
16 just hear what the government's view on restitution is, and
17 let me see if I understand it and then you can expound on it.
18 I understood that the government's position was that
19 this was a case that the Court could order restitution for
20 under the Mandatory Victim Protection Act, but that
21 determining it based on salary was too speculative but
22 National Grid would be entitled to attorneys' fees.
23 Is that what the government's position is?
24 MR. MCCONNELL: Generally that's correct,
25 Your Honor. I think National Grid certainly qualifies as a

6

victim under the Mandatory Victims Restitution Act and they're seeking two categories of restitution, legal fees, as you mentioned, which as a matter of principle we believe is appropriate.  It's something that courts have ordered in similar situations.  One thing I would point out though is that while the government and Probation had been supplied with backup documents supporting the figure that they're seeking legal fees for -- I don't believe defense counsel has seen that, but as a general matter, yes, we agree that legal fees are appropriate for restitution in a situation such as this.

The second category of restitution, which is really all of the compensation that was paid to the defendants during their employment at National Grid is, as we say in our letter, it's difficult to justify, given the case law and based on the facts in this case, and that's simply because we don't have a methodology or underlying records to support that figure and so it's a somewhat arbitrary request, certainly from our perspective at this stage.  You know, other courts have been comfortable awarding a portion of compensation as restitution even where the facts are murky, but that's rarely exceeded 20 to 25 percent based on the cases that we've surveyed.

One other thing to note is that we do not have any indication that the contracts that the defendants accepted bribes for were materially inflated to any measurable degree and that sort of complicates the problem of calculating

1  restitution in a case like this.  That's not to say that
2  compensation is therefore off the table, but again, it
3  complicates the ability of the parties and the Court to come
4  up with some sort of method for calculating an appropriate
5  restitution here.
6              THE COURT:  Well, you cite the *Razzouk* case, and
7  that case appears to answer the question that was left open in
8  *Bautista*, which is assuming that the elements of the crime
9  that the defendant pled guilty to do not make it a property
10 offense.  And there is case law that says bribery is not a
11 property offense, but the question *Razzouk* answers is, well,
12 you can look to see if the bribery was done in such a way to
13 involve fraud and deceit.  So how do you meet that element, to
14 say that it was fraud and deceit if there is no loss that you
15 can point to?  That is the question that I was not clear on.
16             MR. BUFORD:  Your Honor, I think what we would say
17 on that is that the strict language of the statute is that
18 offenses against property, including those committed by fraud
19 and deceit.
20             THE COURT:  Right.
21             MR. BUFORD:  So I think it stretches a little bit
22 further than the strict elements of property and in a
23 situation like this where you have defendants taking bribes to
24 corrupt the employment process or the rules governing
25 procurement that would otherwise apply and doing so in a

8

1  surreptitious manner.  And we would cite to sort of the coded
2  language from the text messages that are described in our
3  sentencing memoranda.  It appears that they knew that what
4  they were doing was contrary to the interests of their
5  employer and therefore, again as in *Razzouk*, it would be
6  possible to theoretically, under the law, come up with a
7  figure of compensation that would be a component of
8  restitution.
9       And in addition to the documented losses in the
10 *Razzouk* case, Judge Ross also awarded I think 20 percent of
11 the relevant employees' compensation in the form of
12 restitution to the victim.  And again, our position here would
13 be that that's theoretically viable, provided there would be a
14 sound methodology to come up with something that would be
15 other than an arbitrary figure.  And here, in our submission,
16 we just note that it is challenging to come up with a
17 methodology that would produce a defensible principal
18 percentage of compensation.
19      THE COURT:  So what *Razzouk* says, the statute
20 suggests that the way the crime is carried out is relevant.
21 What fraudulent activity -- this is not clear to me.  Perhaps
22 you could repeat it.  What is the fraudulent activity that the
23 defendants engaged in as opposed to just accepting bribes?
24 What was fraudulent about their activity?
25      MR. BUFORD:  I think the fraud, Your Honor, would be

9

1  the concealment of the fact that they took bribes, to include,
2  as we said, the sort of coded language in the text messages.
3          And *Razzouk* involved a plea to Section 666, the
4  federal program bribery statute, which again on its face would
5  seem to contemplate only the paying or acceptance of bribes.
6  But in *Razzouk* itself, there was a finding that it defrauded
7  an employer; in that case, Con Ed was entitled to a percentage
8  of the compensation that it paid to the employees for
9  faithless services during the time period that the offense was
10 being committed.  And the idea would be the defendants --
11 again, if you don't have to look at the strict elements, the
12 fraud was that they led their employer to believe they were in
13 compliance with the best interests of their employment when,
14 in fact, that was not the case based on the underlying
15 conduct.
16          THE COURT:  Do you have any evidence that Con Ed
17 lost money, could have gotten more favorable deals, anything
18 like that?
19          MR. BUFORD:  So in this case, the victim is
20 National Grid.
21          THE COURT:  I am sorry.  I was thinking of *Razzouk*
22 when I said that.  National Grid, I apologize, yes.
23          MR. BUFORD:  No, Your Honor.  Our investigation
24 indicates that this was more of a situation where relatively
25 fair market value contracts were steered, for lack of a better

10

1  word, towards a preferred vendor in exchange for the bribe
2  payments.  But the evidence that we have seen indicates that
3  in this case National Grid basically got what it paid for in
4  terms of the disbursements to the vendors at issue.  And our
5  understanding, based on discussions with counsel for National
6  Grid, is that their internal findings revealed more or less
7  the same.
8           THE COURT:  So the fraud was that they did not
9  reveal to National Grid that they were taking bribes?
10          MR. BUFORD:  That would, I think, be the fraud or
11 deceit that was implicated by the conduct here, Your Honor.
12          THE COURT:  Before I hear from National Grid,
13 Mr. Wikstrom, do you want to -- I think you addressed this in
14 your papers.
15          MR. WIKSTROM:  Yes, Your Honor, if I may.
16          Each and every one of the cases National Grid cites
17 and the government cites in support of this notion is a case
18 involving a conviction for fraud.  That was the case in
19 *Donaghy*, the NBA referee charged with stealing the proprietary
20 information of the NBA and then marketing it.  That was the
21 case in *Napout*, that was the case in *Bahel*, and that was the
22 case with *Razzouk*.
23          THE COURT:  Well, how was it the case with *Razzouk*?
24 I thought it was just a bribery.
25          MR. WIKSTROM:  Because the record showed that the

11

1  kickbacks were generated through duplicate invoices, payments
2  for services never rendered.
3         THE COURT:  But there is no proof.
4         MR. WIKSTROM:  Well, the manner in which the -- in
5  which *Razzouk* and the contractor in that case, an electrical
6  engineer company called Rudell, the way the kickbacks were
7  generated were, according to the District Court and the Second
8  Circuit, amply demonstrated through double-billing, inflated
9  invoices and established fraud costing Con Ed at least
10 $6 million based on a forensic report that they commissioned
11 KPMG to do.
12        The thing about this case, and it is unlike any of
13 the cases that the government or National Grid cites, is that
14 this did not involve fraudulent overbilling or payment for
15 services not rendered or any other kind of fraud, and that is
16 the -- those are the sholes on which this claim flounders.
17 Because it is hornbook law that restitution as part of the
18 criminal sentence is supposed to make the victim whose damages
19 are proximate and directly caused by the wrongdoing caused a
20 financial loss, and here there is none.  This is -- granted,
21 it's a gain to Mr. Zavada and Mr. McCrann and the other three
22 defendants, but there is no corresponding loss.
23        And by the way, it doesn't help, I don't think; to
24 say that the fact that these gentlemen used coded language to
25 conceal that they were getting kickbacks doesn't establish any

1  loss on the part of National Grid.  That shows people have a
2  guilty conscious about the kickbacks they're getting and so
3  they refer to it through euphemisms.
4          THE COURT:  Well, how about the claim for attorneys'
5  fees in terms of assisting with the investigation?
6          MR. WIKSTROM:  I think, Your Honor, the law is, and
7  this comes from *Dorno*, which was distinguished by *Razzouk,* is
8  that this is not a crime against property and wasn't committed
9  in a way to make it an offense against property.  National
10 Grid is not entitled to attorneys' fees either.  I recognize
11 that *Razzouk* distinguishes *Adorno*, but it distinguishes it in
12 ways that are applicable here.  It says *Adorno* -- you know,
13 there were no demonstrable losses, it's going to be cumbersome
14 and the like.
15         I just want to add, on the attorneys' fees, one
16 point, Your Honor, and that is both National Grid and the
17 government come before you and say this liability for the
18 $250,000 legal fees should be joint and several.  There is no
19 basis in the law for joint and several liability across five
20 separate criminal cases against five separate individuals with
21 different relevant conduct.  The idea that Richard Zavada
22 should pay restitution for some other criminal case before
23 Your Honor for the crimes that that individual committed is --
24         THE COURT:  Oh, it should be divided by five?
25         MR. WIKSTROM:  I'm sorry?

1  THE COURT: The fees, assuming they were
2  appropriate, should be divided by the number of defendants and
3  each held only liable for that amount?
4  MR. WIKSTROM: Yes, of course, Your Honor. Because
5  they're not alleged to have acted in concert. There's no
6  conspiracy count. Losses -- you know, the restitution is tied
7  to the offense of conviction and each one of these gentlemen
8  has a different offense of conviction. The only thing that
9  united them was they did the same thing and they had the same
10 employer, but the criminal conduct, the kickback receiving is
11 all separate and there is no basis in the law for joint and
12 several liability. This is part of Mr. Zavada's punishment.
13 He should not be punished by an order directing him to pay
14 restitution generated by the crimes of someone else unrelated
15 to him. So there's no basis for joint and several liability.
16 3664(h) is the section that applies and it says the Court can
17 make restitution joint and several or proportional if there is
18 more than one defendant. And in the case of Mr. Zavada, my
19 client, there is not more than one defendant. There is one.
20 So at most, this should be a proportional award if you find
21 that the attorneys' fees are --
22 THE COURT: And I have not heard from National Grid,
23 but what if their position is this amount of work that we did,
24 we would have had to have done that same amount of work for
25 each defendant, so it really does not make a difference, there

1  is no way to apportion it?

2        MR. WIKSTROM:  Well, I'm not sure.

3        THE COURT:  I mean, one of the things is we do not
4  have the information before the Court, or you have not seen is
5  where this $250,000 comes from.

6        MR. WIKSTROM:  Right.

7        I also don't know, Your Honor, to what extent the
8  investigative cost, which included I think more than half is
9  what I'm told by National Grid's counsel, but a large figure,
10 for forensic accounting or a forensic accountant.  So I assume
11 we'll be educated between now and May, but I'm not sure to
12 what extent that expenditure was done to comply with the
13 government request or is part of a subpoena compliance, given
14 the fact that Mr. Zavada was -- consensually monitored
15 proceeds of the crime were located in his home and, within
16 weeks of his arrest, I think he waived most discovery and
17 immediately pleaded guilty.  I'm not sure how much government
18 investigation was done with National Grid prior to the arrest,
19 but those are all details that we will learn.  My point is
20 just that there should not be joint and several liability.
21 And if it's the case that National Grid would have had to pay
22 the same were it a single defendant, then theoretically it
23 would entitle them to receive attorney's fees five times over,
24 which doesn't -- it just don't make any sense.  So I don't
25 know to what extent the subpoena practice that it was

1  responding to or request for interviews on the part of the
2  government would be divided up, but again, I think that
3  they're not entitled to any of it since this is not a crime
4  against property.
5          This doesn't mean National Grid has no remedy, by
6  the way.  If National Grid feels that they've been wronged by
7  this conduct, they can bring a civil action against Mr. Zavada
8  and attempt to get it there.  But I was objecting immediately
9  to the notion that they can come to court as part of a
10 criminal sentencing a few days before the imposition of
11 sentence is scheduled and ask Your Honor to alleviate them of
12 this burden.  They sat on their hands for months and months;
13 we shouldn't have to do it in a rush and as part of a criminal
14 sentence when there are other remedies.
15         But again, this is not a crime that was against
16 property and it wasn't committed in a way so as to make it
17 against property, so I don't believe that they're entitled to
18 restitution at all.  And in the alternative, it is such that
19 the underlying circumstances are murky and it will be
20 cumbersome and time consuming to ferret out whether there
21 should be a restitution component.
22         THE COURT:  Thank you, Mr. Wikstrom.
23         Mr. Karpf, did you want to add anything to
24 Mr. Wikstrom's remarks?
25         MR. KARPF:  Judge, yes.

1    The only thing I would add is the Court did make
2 reference to the attorneys' fees and splitting it five ways.
3 I would just proffer that it should be split seven ways
4 because there are two other defendants, the bribe givers.  So
5 if the Court is going to find that there's responsibility for
6 attorneys' fees, it should be a division by seven, not five.
7    THE COURT:  Okay.  Thank you.
8    Let me hear from counsel for National Grid.
9    MS. ESTEVAO:  Thank you.
10    Just so correct one thing that Mr. Wikstrom said in
11 terms of the restitution that we're seeking for attorney's
12 fees, it's not accurate that that includes a forensic
13 accounting.  It really is just our attorneys' fees that does
14 include some contract work regarding subpoena responses, so it
15 does not include the forensic accounting.
16    THE COURT:  Well, are you capable of dividing it
17 among the defendants?  In other words, is there work that you
18 did with regard to each defendant such that you could split up
19 the fees per defendant as opposed to making it against the
20 five or seven defendants here?
21    MS. ESTEVAO:  I have not gone through our billing
22 records to see if that's possible, but we can do so.  I would
23 just note that the statutory cite to -- which would allow the
24 Court to apportion liability either among all the defendants
25 or to make each defendant liable for the full amount is

17

1   3664(h), which says if the Court finds that more than one
2   defendant has contributed to the loss of the victim, the Court
3   may make each defendant liable for payment of the full amount.
4   So in the case where each defendant contributed to our
5   attorneys' fees which involved responding to subpoena requests
6   and also include our research with respect to restitution
7   which applies to each defendant, all defendants should be
8   liable for the full amount.
9           Turning to the question about whether or not
10  National Grid qualifies as a victim, I would just point out
11  that -- and I rely on the government's statements about the
12  facts in the record, but would point out that as a matter of
13  law we qualify, National Grid qualifies as a victim.  The
14  Second Circuit in *Bahel*, B-a-h-e-l, made clear that an
15  employer's losses in the form of loss of honest services
16  clearly fall within --
17          THE COURT:  But there's no honest services charge
18  here.
19          MS. ESTEVAO:  I believe that --
20          THE COURT:  And do you agree with the fact that
21  restitution has to be geared to the count of conviction?
22  There is no charge here for the loss of honest services the
23  way it was in some of those other cases.
24          MS. ESTEVAO:  Of course.  We read the *Razzouk* case
25  together with *Bahel* as saying that you look to the facts of

Andronikh M. Barna, Official Court Reporter, RPR, CRR

18

1   the offense.  And here, based on what the government has said,
2   the facts suggest that National Grid lost its honest services.
3           THE COURT:  No, but that is a different charge.  The
4   facts have to establish fraud and all that I have heard
5   articulated as to what the fraud was, was the fraud was we did
6   not tell National Grid we were taking bribes.  Is that the
7   universe of the fraud?
8           MS. ESTEVAO:  We will rely on the government's
9   statements in terms of the actual facts of the case, but our
10  reading of the case law is that the defendants took property
11  as a result of their offense which was the loss of honest
12  services to National Grid.
13          THE COURT:  All right.  And it is correct -- let me
14  just ask the government -- that the fraud that you would prove
15  is that the defendants did not tell National Grid they were
16  accepting bribes?
17          MR. MCCONNELL:  Yes.
18          THE COURT:  Okay.  If National Grid wishes to pursue
19  its request for attorneys' fees, then you are going to have to
20  provide the Court with a detailed breakdown of those fees just
21  as if you were submitting a fee application, the hours spent,
22  who did what.  And then also indicate how these fees relate to
23  each defendant, either to say that all of these fees were
24  necessary even if there had been one defendant or if there is
25  some way you can break it down.

1    I should say that without resolving the issue, I
2    think that there is a very serious question under the facts of
3    this case about whether National Grid is, in fact, entitled to
4    fees.  But if you want to pursue them, then you are going to
5    have to provide that additional information.  And you can also
6    provide any statement that you want to make about how this
7    *Razzouk* case affects this or direct it to any of the
8    statements of counsel that have been made today.
9        And so I will direct that National Grid and the
10   government, to the extent that the government still thinks
11   that fees are appropriate, that again those submissions be
12   made March 4th and a reply March 14th on the same schedule
13   that we have set for the issue about the difference between
14   the defendants.
15           MR. KARPF:  Judge, excuse me.
16           You had indicated defendants' response would be
17   March 18th.
18           THE COURT:  I am sorry.  Yes.
19           MR. KARPF:  Thank you.
20           THE COURT:  March 18th.  I misspoke.
21           Is there anything else the parties think we need to
22   address today?
23           MR. MCCONNELL:  Not from the government.
24           THE COURT:  From the defense?
25           From Mr. McCrann's counsel?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

20

1   MR. KARPF:  No, Judge.  Thank you.
2   THE COURT:  Mr. Zavada?
3   MR. WIKSTROM:  No, Your Honor.  Thank you.
4   THE COURT:  All right.  Thank you all.
5   (Matter concluded.)
6
7                *    *    *    *    *
8
9   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
10
11      /s/ Andronikh M. Barna              February 1, 2022
    _____      _____
12         ANDRONIKH M. BARNA                    DATE
13
14
15
16
17
18
19
20
21
22
23
24
25